UNITED STATES v. ONE DISTILLERY AND FIXTURES, etc.
(FOSTER, Claimant).

(District Court, W. D. North Carolina.   December 1, 1911.)

1. INTERNAL REVENUE (§ 46*)—DISTILLERY—FORFEITURE.
   Where the owner or proprietor of a registered distillery, his agent or servant, overworks the same beyond its registered capacity with intent to avoid payment of the internal revenue tax on the product, or so operates the same with a view and purpose to defraud the United States of the tax on the distilled spirits he produces or any part thereof, the distillery and its equipment and the spirits distilled are subject to forfeiture to the United States whether he accomplishes his purpose or not.

   [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

2. INTERNAL REVENUE (§ 46*)—DISTILLERY—FOREFEITURE—REMOVAL OF PRODUCT.
   Removal of distilled spirits, the product of a distillery, by the operator or proprietor without payment of the tax, is ground for forfeiture of the distillery and the product.

   [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

3. INTERNAL REVENUE (§ 46*)—DISTILLERIES—FORFEITURE PROCEEDINGS.
   Where proceedings are instituted to forfeit a distillery plant and distilled spirits for alleged violation of internal revenue laws, the owner may intervene and contest the proceedings, or, in case a bond is given for the appraised value of the property, the proceeding may be contested by the surety.

   [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

4. INTERNAL REVENUE (§ 46*)—DISTILLERIES—OPERATION—INTERNAL REVENUE OFFICERS—AUTHORITY.
   Where officers of the internal revenue service are of the opinion that a registered distillery is being worked beyond its registered capacity with intent to defraud the United States laws, officers may take possession of the distillery and operate the same for a short time in order to ascertain its capacity and determine whether it is being run correctly and according to law.

   [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

5. INTERNAL REVENUE (§ 46*)—DISTILLERIES—OPERATION—FORFEITURE—DERELICTION OR MALFEASANCE OF REVENUE OFFICERS.
   The government does not lose its rights to forfeit a distillery operated in violation of law for the purpose of defrauding the government by rea-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

son of any failure of the officers of the government to discharge their duty or because of their dereliction or malfeasance.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

6. INTERNAL REVENUE (§ 46*)—DISTILLERIES—FORFEITURE—VIOLATION OF LAW —BURDEN OF PROOF.

In a libel in rem to forfeit a distillery and distilled spirits for violation of the internal revenue laws, the United States is only required to prove such violation by a preponderance of the evidence.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

7. INTERNAL REVENUE (§ 46*)—DISTILLED SPIRITS—REMOVAL.

Actual removal of distilled spirits from a registered distillery by the employés and operators thereof, whether the ostensible owner of the distillery was present or not, if done in the course of the operation of the distillery, to a place other than a distillery warehouse, with intent to defraud the government of the tax thereon, makes the intent indisputable and authorizes a forfeiture of the distillery and the spirits.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

Libel by the United States against One Distillery and Fixtures and 433 Barrels of Corn Whisky, the property of claimant, D. C. Foster. Judgment for libelant.

This was a proceeding in rem tried in the District Court of the United States for the Western District of North Carolina, at Greensboro, at the June term, 1910. In the year 1905, and for several years thereafter, D. C. Foster was the owner and operator of a registered distillery of spirits from grain located in the town of Williams, Yadkin county, N. C., in said district. The registered capacity of the distillery was 200 bushels of material per day, and a required yield of 4 gallons of 100 proof distilled spirits per bushel. About the 1st of November, 1905, an internal revenue agent, accompanied by two deputy collectors of internal revenue, visited the distillery, operated it for a day, and found that the registered capacity was being, as they claimed, greatly overworked; that the material which had been furnished for the distillery was exceeding the amount allowed, by about 50 bushels per day; and that the yield of the distillery, instead of being in accord with the reports which had been made theretofore, was largely in excess. Thereupon, upon the report of the agent, the entire property, including the distillery fixtures and distilled spirits on hand, were seized by the collector of internal revenue for the Fifth collection district of North Carolina as forfeited to the United States. A libel of information was filed by the attorney for the United States against the property, and the United States marshal for the Western district of North Carolina, upon a warrant of arrest issued by the court, took custody thereof. The allegations of the libel were that the distiller had operated his distillery with intent to defraud the United States of the taxes upon the spirits distilled by him, and also specifically that the distiller had removed from the distillery premises, to a place other than the distillery warehouse provided by law, distilled spirits produced at the distillery, upon which the taxes due the United States had not been paid. The property was appraised at $13,882.86, and D. C. Foster, who intervened as claimant, was, by order of the court, permitted to have restitution of the said property upon filing a bond in the appraised value thereof with the United States Fidelity & Guaranty Company of Baltimore, Md., as surety. The claimant, D. C. Foster, filed an answer denying the allegations of the libel, and upon the issue thus raised the case was tried by the court and a jury at the term above stated, and a verdict rendered in favor of the United States.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

193 F.—46

A decree of forfeiture was accordingly entered, and judgment against Foster and the surety upon the bond rendered for the amount of the appraised value of the property and interest, together with the costs of the proceeding.

The testimony on the part of the United States tended to show that the distiller was using in the operation of his distillery a much larger quantity of material than was authorized under his survey; also, that distilled spirits had been removed in large quantities from the distillery cistern room and concealed in the tobacco barn of a man by the name of Kiger, who owned a farm near by; that other quantities were removed from the cistern room without the payment of taxes and buried in Kiger's cotton field, and still other spirits were carried from the distillery and buried in a meadow upon an adjoining plantation, whilst a large quantity was removed to the rectifying establishment of the Old Nick Williams Company, which was situate a short distance from the distillery. The claimant introduced no testimony, but relied in the argument to the jury upon alleged mistake in the test made by the revenue officers in operating the distillery, and upon the impeachment of and character of the testimony of witnesses for the United States. Foster, the distiller, did not appear at the trial; but the defense was conducted in behalf of the United States Fidelity & Guaranty Company, the surety upon the bond.

A. E. Holton, U. S. Atty., and A. L. Coble, Asst. U. S. Atty.

G. S. Bradshaw and S. B. Adams, for the Bonding Company.

BOYD, District Judge (charging the jury). Gentlemen of the Jury: This is what the law calls a proceeding "in rem"; that is, a proceeding against the thing—the property—on the ground that the property itself has violated the laws of the United States. The purpose of the trial is to ascertain whether or not certain property described in the libel, which is the legal paper containing the charges against the property, are true, to the end that it may be determined whether or not that property is forfeited to the United States.

[1] The law is, gentlemen, that if a distiller—that is, the owner, or the proprietor, of a registered distillery—his agent or servant, commits certain unlawful acts in the operation of the distillery, thereby the distillery, its equipment, and whatever distilled spirits are on hand, are forfeited to the United States and become the property of the United States. One of the unlawful acts, which works a forfeiture of the distillery, and the other property, is if the distiller operates his distillery with the intent to evade the payment of the tax upon the product; or, in other words, if he carries on his business, having in view the purpose to defraud the United States of the tax upon the distilled spirits he produces, or any part of it.

The law says, if he operates with that intent, whether he accomplishes his purpose or not, if he has that in mind during the progress of his work, and that fact is ascertained, then the property—that is, the distillery and its equipment and the spirits—are forfeited and become the property of the United States.

[2] Further than that, the law says that if any distiller—and the term here means the proprietor, the owner, not the man who may do the manual labor, but the proprietor—if any distiller shall remove or cause to be removed from his distillery any distilled spirits, the product of the distillery, without the payment of the tax, that that act, when done, forfeits the distillery, together with the equipment and the spir-

its he may have on hand, to the United States, and, when the act is done, the property, the title to the property vests in the United States at that moment and becomes its property by the law.

Now, in this case, in the year 1905, a distillery was operated at Williams, in Yadkin county, in this district, in the name of D. C. Foster. About the 1st of November, in that year, the internal revenue officers came to the conclusion that there had been violations of the law committed at that distillery, which warranted its seizure, and thereupon the distillery was seized on the ground that it was forfeited to the United States. If nothing else had been done after the seizure, if after notice no claimant for the property had appeared, then upon the filing of this libel, which is simply the indictment against the property, and a formal proceeding in the court, the adjudication would have been that the property was forfeited.

[3] But the law allows any person claiming property seized, alleged to be forfeited for a violation of the internal revenue law, to intervene as claimant and contest the charges made against the property; so, under that law, Foster intervened here, and he filed an answer saying that he was the owner of the property described in the libel, and denying that there had been any violation of the law at the distillery, such as was alleged in the libel, upon which the forfeiture was claimed.

In the due course of the case, gentlemen, the property was appraised. The law authorizes that to be done. The law says that if property is seized by the United States authorities as forfeited for a violation of law, if conditions are such as exist in this case, appraisers may examine the property and return to the court its value, and thereupon the claimant, if one has intervened to dispute the alleged ground of forfeiture, shall have the property restored to him by giving bond in the appraised value of the property, so that in the result of the case finally, if the property is adjudged to be forfeited, instead of the government taking the property itself, the claimant or whoever is upon the bond is required to pay the money to the amount of the bond.

That is the situation in this case, gentlemen. The seizure was made. The property was appraised in the regular course. That appraisement was returned to the court. Foster came in, and was allowed to intervene as claimant, and file his answer, denying the charges which were made against the property. Thereupon Foster petitioned the court to be allowed to retake the property, and substitute a bond for it. In other words, instead of keeping the property in custody, or selling it, as the government would have a right to do, if it was such as would depreciate in value, Foster said:

"Value it, and let me give a bond, and let that bond await the result of the trial."

This bond for the appraised value was given, and the Bonding Company became surety.

That is where this Bonding Company, as it is called in the course of the trial, became interested in the suit. Therefore, although Foster has not appeared, the Bonding Company, being interested in the result of the case, is allowed to appear by its attorneys and contest

the forfeiture, because if the case goes in favor of the government, the Bonding Company, beyond what Foster may be able to pay, he being first liable, so far as appears here now, will have to pay the money—that is, if Foster cannot pay it, or it cannot be made out of Foster by execution.

So then, gentlemen, that is the situation as presented to you upon the law of the case to that extent.

[4] There has been some comment by counsel (however, I do not mean to say that it was not proper) upon the fact that the revenue agent with his posse went to this distillery on the 1st day of November, 1905, took possession of and proceeded to operate it. It is due, gentlemen, to the officers of the law for the court to say that they had a right to do that, because the law provides that any registered distillery shall be open at all times for the ingress and egress of properly authorized officers of the internal revenue service, for inspection; and it even goes so far as to authorize an agent of the internal revenue service to operate the distillery for a short time in order to ascertain its capacity, and see if it is being run correctly and according to law. So, the revenue agent violated no law when he took possession of this distillery and operated it for a day's run as described here.

As to the result of that work, and what the product was, and how far it affects this case, that is a matter for your consideration.

[5] There is another general proposition of law, gentlemen, and that is this: The government does not lose its rights by reason of the failure of its officers to discharge their duty, or because of their dereliction or malfeasance, and if it be true that at this distillery the way was opened for a violation of the law, such as is alleged here, and was opened by the officers assigned there, or any of them, and the distiller, or his employés or agents, took advantage of that opportunity, the government would be entitled to recover if the act upon which the forfeiture is claimed was committed.

Then, gentlemen, this case, divested of all other views, resolves itself simply into this: Is the property described in the libel forfeited to the United States for the causes alleged therein?

[6] The United States has alleged that Foster, or his agents, or his employés, no matter which, during the operation of this distillery by him, operated it, intending at the time of the operation to defraud the goverment of the United States of the tax upon the product of the distillery or a part of it. The government having made that allegation, the burden rests upon it to prove it, not beyond a reasonable doubt, but by the weight of the testimony; that is, in order to return a verdict for the United States, the jury must have that quantum and character of testimony which by its preponderance satisfies their minds that the allegation is true.

As I said a while ago, it would not be necessary that the distiller, or his agents or employés, actually accomplished the fraud, if the intent to commit the fraud in the operation of the distillery has been shown, because if the jury should be satisfied that there was a crowded mash the day the internal revenue officers went there, and that such mash had been put into the distillery for the purpose of

making a run greater than the usual capacity of the distillery showed, and the further purpose was to evade the taxes upon the surplus, although the parties were overtaken and stopped before the object was accomplished, yet if the jury concludes from the circumstances, the testimony of the witnesses, and the conditions surrounding the distillery at the time, that the operators had it in mind to evade the taxes upon any part of the product, or defraud the government of such taxes, then the United States has proven its case to that extent.

Of course, gentlemen, you have to take this testimony and put upon it such value as you see proper. The testimony so far as delivered by the witnesses orally is uncontradicted. There is no contradiction except in so far as circumstances, environments, and conditions attending the delivery of the testimony itself may create contradiction. I say, therefore, if you believe from the testimony of the revenue agent and these others who went there on the 1st of November and ran out the two fermenters on the 2d, if you believe from their testimony that there were 30 or 40 bushels of meal more in the mash than was allowed, and you are satisfied from that fact that the distiller or his agents were there operating the distillery with a crowded mash, as it is called, having in mind the purpose to evade the payment of the taxes on the spirits produced to defraud the government of the tax on any part of it, then the law says that the government is entitled to have you return this issue in the affirmative and say, "Yes"—that this property is forfeited.

To go further, gentlemen, there is the uncontradicted testimony of Kiger and his two sons, also that of Faircloth and Dull, and three colored drivers, that certain distilled spirits produced at that distillery were removed from the cistern room without the payment of taxes. As I said, so far as appears here, that testimony is uncontradicted, and the only question for you is whether you believe that testimony, or enough of it to satisfy you that the removal took place, and in passing upon that question you are authorized to consider the fact as to whether or not there is reason that you should not believe the testimony.

[7] If, therefore, you are satisfied from the weight of this testimony that spirits were actually removed from the distillery, no matter by whom, if it was done by the employés and operators of that distillery, whether the ostensible owner of the distillery was present or not, if, in the course of the operation of that distillery, they carried distilled spirits away from the cistern room to a place other than a distillery warehouse with the intent to defraud the government of the tax upon it, that makes the intent, we may say, indisputable.

The method is prescribed by law by which distillers are required to handle the product of their distilleries under the supervision of the officers with a view of securing the government's taxes upon such product. This distillery was operated upon what is called a continuous process; that is, after the beer, which was fermented, went into the still and it was put to work, the product ran along in a continuous way without any one having access to it, until it emptied into the receiving cisterns in what is called the cistern room. There is but

one place upon the line of transit of the spirits where it can be reached at all, and that is what is called the "indicator box," as the court understands it.

That is a box so constructed that it has a little door at the top that can be opened, and the spirits run through that box, and the government officer has a key to it, and he can go there during the process of distillation and test the product and see what proof it is running, so if it is below the proof he can cut off the distillation and stop, because the custom is generally not to run into the cistern room distilled spirits below 100 proof; the unit or basis of taxation being 100 proof spirits. That is, every gallon of 100 proof spirits pays the tax of $1.10, and if it goes into the cistern room less than 100 proof the $1.10 tax is paid upon the wine gallons and not upon the proof gallons. So if the spirits are run out at 90 or 95 proof the distiller loses that much in the payment of the tax. Of course, the distiller can run out the spirits if he chooses at 110 proof, or 120 or 130 proof, or just as high as he pleases; but then the tax is paid upon the aggregate number of 100 proof gallons. That is, if he ran it at 125 proof, every time he measures out 4 gallons he would have to pay tax on 5 gallons. You see. But if he runs it below 100 proof he loses, because, as stated, he pays in that event on the wine gallons.

The proof is a very important element in the distillation of liquor, because the high proof is more easily transported, and it is desirable for what are called rectifiers because of the fact that in the smaller volume it is more readily and conveniently handled before rectification.

I was going to say that all spirits go into the cistern room, as has been said, and the officer has a key to that. That has a government lock on it. The spirits run into receiving cisterns, and the officer goes in there, or some person in his presence, and takes the distilled spirits out of the receiving cisterns, puts it into barrels or casks, and weighs it. He gauges it and weighs it, and thereupon he puts what is called a warehouse stamp on each package, and then it is his duty to see that it is taken directly from the cistern room to the distillery warehouse on the premises, which is also a building with a government lock and key, and the key is in the possession of the officer.

The law requires the spirits produced at the distillery to be carried from the cistern room to the warehouse with the warehouse stamp upon it, showing the number of the package, and the number of wine gallons and proof gallons in it, and it remains in the warehouse until the distiller makes his application to the collector in accordance with the report of the warehousing to tax pay and take possession of the spirits himself. He sends up withdrawal papers to the collector with the money for the tax. He describes the package, the serial number, the number of wine gallons it contains, and the number of proof gallons it contains, and thereupon the collector issues stamps to be put upon the package so described. The officer in charge of the warehouse takes the stamp, adjusts it to the package, and cancels it, and not until then can the package be removed from the warehouse. The law requires, however, that it be then removed.

The removal of spirits distilled from grain from the distillery prem-

ises in question in any other way than by the method I have described was unlawful. The act of Congress of August 28, 1894, provides for general bonded warehouses to which spirits distilled from grain may be removed: but the provisions of that act are not involved here. So far as the Foster distillery was concerned, the taxes upon the spirits produced there could not have been paid except as I have stated, unless the government seized it and sold it, and had the taxes paid at the time of the sale.

It is insisted that some of these spirits were taken from the distillery to the rectifier. That would be as unlawful, if the taxes were unpaid, as if taken to the woods or the tobacco barn. A rectifier does not pay any tax except $100 a year for the privileges of rectifying. He does not pay the per gallon tax at all. The way the rectifier operates is this: He is presumed to buy tax-paid spirits, which he carries to his rectifier in the original packages with the stamps affixed and canceled. He reports to the collector that he has a certain package, with a certain stamp, a certain serial number on it, containing so many gallons, etc.

In the middle of the stamp is what they call a clip on which is the description of the package, containing the serial number of the package, the number of gallons, the name of the distiller, and the collector who issued the stamp. That clip has under it a red paper without mucilage so it does not adhere to the barrel, and this clip is cut out and sent to the collector to show that the rectifier has the package he claims to have. Thereupon the rectifier is given credit on the collector's books for the particular package.

For instance, if a rectifier buys a 50-gallon barrel of 100 proof spirits distilled by a certain person, with the tax-paid stamp issued by a certain collector thereon, he reports that to the collector of his district. He says, "I have in my rectifier a 50-gallon package, stamp # ———, and I wish to dump it for rectification." And the collector gives him credit on his books for 50 gallons of 100 proof spirits, and the rectifier can make as many gallons of spirits out of that as he pleases, so long as he can trace that number of gallons to this package; and that is the way distilled spirits are changed from the proof of the original tax-paid package. This is the modus operandi by which the proof of distilled spirits is changed from that of the original packages upon which the taxes have been paid. I suppose very little 100 proof spirits are sold at the places where they deal it out for beverages. The rectifier takes it and runs it through his rectifier and by the introduction of distilled water, or whatever he sees proper, he increases its volume, and decreases its proof to whatever he pleases. He pays no additional taxes.

So then, the removal of the spirits from the cistern room to the rectifier was unlawful, if you find it took place, just as unlawful as if you find they carried it to Kiger's tobacco barn or Whitman's potato field.

I have given you these details to the end that you might fully understand, and now it comes back to the original proposition: Are you satisfied upon this testimony that the distilled spirits produced

at that distillery, or any part of it, was removed from the distillery unlawfully? If it was carried from the distillery to the rectifier without the payment of the taxes, that was an unlawful removal; if it was carried and buried in the meadows and fields, that was an unlawful removal, and there could be no dispute as to the intent that prompted such removal.

If, therefore, you are satisfied from the testimony that at the time the revenue agent and his associates went to the distillery, or at any other time, the distillery was being operated by Foster, or his agents and servants, with the intent to defraud the government of any part of the taxes upon the product, and conditions there were such as to open the way to the fraud, then the United States is entitled to recover in this case. If you are satisfied that there was an actual removal of any part of the spirits, as described here and contended by the government, that would make a complete offense which would justify a forfeiture, and the United States would be entitled to a verdict.

The testimony is that Yates was the manager of this distillery, as Foster's agent, and if Foster was not there, and his agent committed this offense, and Foster, although not there, allowed it to be done, it would be the same as if he were there, and it would be the same if the government officers there permitted or allowed the offense to be committed.

If you find this issue in favor of the United States, you will say, "Yes"; if not, "No."